# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **TAMEKA TILLMAN** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:17-cv-00475 (APM)** |
| | ) | |
| **WILLIAM P. BARR,** [1] | ) | |
| **Attorney General** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION

## I.    INTRODUCTION

Plaintiff Tameka Tillman was a Budget Analyst at the Department of Justice for more than five years before her termination in September 2013.  Plaintiff, an African-American woman, claims that during her tenure she was subject to discrimination on account of race.  Based on her firing, suspensions, denial of pay increase, leave restrictions, and other allegedly adverse actions, Plaintiff asserts that she was subject to (1) a hostile work environment, (2) disparate treatment on the basis of race, and (3) retaliation following complaints to her Equal Employment Opportunity ("EEO") Office.

Defendant Attorney General William P. Barr seeks summary judgment as to all claims. For the reasons below, the court grants Defendant's motion in full.

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the court substitutes the current Attorney General as the defendant in this case.

## II.    BACKGROUND

### A.    Factual Background

Plaintiff Tameka Tillman was a Budget Analyst for the Administrative Management Section of the Department of Justice's Civil Rights Division from 2008 until her termination in September 2013.  Def.'s Stmt. of Material Facts, ECF No. 24-1 [hereinafter Def.'s Facts], ¶¶ 1, 3; Pl.'s Stmt. of Disputed Material Facts in Supp. of her Opp'n to Def.'s Mot. to Dismiss & Mot. for Summ. J., ECF No. 30-1 [hereinafter Pl.'s Facts]; Decl. of Tameka Tillman, ECF No. 30-2 [hereinafter Pl.'s Decl.], ¶ 3.  As a Budget Analyst, Plaintiff was responsible for "the formation, justification, presentation, and execution for the Division's various budget submissions." *See* Def.'s Ex. C, Position Description, ECF No. 24-4, at 2; *see also* Def.'s Facts ¶ 4; Pl.'s Decl. ¶ 4.

Earnestine Delamar was Plaintiff's first-line supervisor from the time she began in 2008 until January 2010, when Ms. Delamar retired.  Def.'s Facts ¶ 5; Pl.'s Decl. ¶ 5.  Plaintiff's second-line supervisor was Milton McConkey, until late 2011 when he became her fourth-line supervisor.  Pl.'s Decl. ¶ 5.

In January 2009, Ms. Delamar removed Plaintiff from her alternate flexible work schedule ("AWS") citing the need to "see improvement" before she could consider "putting [Plaintiff] back on AWS."  *See* Def.'s Ex. E, Delamar Emails, ECF No. 24-6 [hereinafter Def.'s Ex. E], at 1–2; Def.'s Facts ¶ 9; Pl.'s Facts, ¶ 9 (not disputing that Plaintiff was removed from AWS).  On October 5, 2009, Ms. Delamar sent Plaintiff an email expressing her belief that Plaintiff's feelings toward her had been negative and disrespectful, but that she nevertheless spent "countless hours . . . trying to help [Plaintiff] understand [her] job."  Def.'s Facts ¶ 10; Pl.'s Facts ¶ 10 (not disputing the substance of the email); Def.'s Ex. E at 3.  When Ms. Delamar retired in January 2010, Linda

Ellinger became Plaintiff's new first-line supervisor. *See* Def.'s Facts ¶ 5; Pl.'s Decl. ¶ 5. Plaintiff's performance evaluation for the 2009–2010 year, completed by Ellinger, also noted Plaintiff's need for improvement in the budget formation process. Def.'s Facts ¶ 11; Pl.'s Facts ¶ 11 (not disputing the content of the evaluation). Despite these issues, Plaintiff received a "Successful" overall rating in her 2009–2010 performance evaluation. Pl.'s Facts ¶ 11; Pl.'s Ex. 4, ECF No. 30-5 [hereinafter Pl.'s Ex. 4], at 5–6.[2]

From April 2010 until October 2010, Plaintiff was detailed to the National Oceanic Atmospheric Administration, effectively removing her from the 2010 fiscal year budget formulation cycle. Def.'s Facts ¶¶ 12–13; Pl.'s Facts ¶¶ 12 (not disputing missing the 2010 budget cycle); Pl.'s Decl. ¶ 9. In her 2010–2011 evaluation, Ms. Ellinger again noted that she would like to see Plaintiff "demonstrate a greater initiative in finding ways to improve" her budget formation skills as required for her position. Def.'s Facts ¶ 14; Pl.'s Facts ¶ 14 (not disputing Ellinger's evaluation). Notwithstanding that critique, Plaintiff received ratings of "Excellent" overall, and either "Excellent" or "Outstanding," the second-highest and highest possible marks, respectively, in all categories. Pl.'s Facts ¶ 14; Pl.'s Ex. 4 at 13.

Moeen Chowdhury become Plaintiff's first-line supervisor following Ellinger's departure in November 2011. Def.'s Facts ¶ 6; Pl.'s Facts ¶¶ 5–7. Jody Harry became Plaintiff's second-line supervisor in July of 2012. Def.'s Facts ¶ 7; Pl.'s Facts ¶ 7. In the 2011–2012 evaluation, Mr. Chowdhury reported that Plaintiff performed her budget formulation duties at a "minimally satisfactory level" and her work "contained numerous and substantive errors." *See* Def.'s Ex. I, 2011–2012 Performance Evaluation, ECF No. 24-11 [hereinafter Def.'s Ex. I], at 2; Def.'s Facts ¶¶ 16–17; Pl.'s Facts ¶¶ 15–17 (not disputing the report itself). Mr. Chowdhury rated Plaintiff as

---

[2] The court uses CM-ECF generated pagination for this Exhibit.

"Successful" overall, and her ratings in individual job elements ranged from "Minimally Successful" to "Outstanding."  Pl.'s Facts ¶ 17; Pl.'s Ex. 4 at 21.

On May 23, 2012, Plaintiff filed a formal complaint of discrimination with the EEO Office against Mr. Chowdhury and Ms. Harry.  Pl.'s Decl. ¶ 10.

Later, in July 2012, Plaintiff was assigned to complete the Fiscal Year 2014 "control numbers" by August 16, 2012.  Def.'s Facts ¶ 21; Pl.'s Facts ¶ 21 (not disputing that Plaintiff was "initially responsible for the control number report in 2012").  Plaintiff claims that at some point in 2012 the project was assigned to an agency contractor but then reassigned to her in December 2012.  Pl.'s Facts ¶ 21.  Defendant contends that Plaintiff received information from the contractor on August 21, 2012, to complete the assignment.  Def.'s Reply in Supp. of Mot. to Dismiss & Mot. for Summ. J., ECF No. 31 [hereinafter Def.'s Reply], Def.'s Reply in Supp. of Stmt. of Undisputed Material Facts, ECF No. 31-1 [hereinafter Def.'s Reply Facts], ¶ 24.  Regardless, it is undisputed that the project was delayed, and that Mr. Chowdhury asked to meet with Plaintiff on several occasions in January to assist her.  Def.'s Facts ¶¶ 26–27; Pl.'s Facts (undisputed).  Plaintiff stated on January 23, 2013, that she would "complete the control numbers today," but did not do so.  Def.'s Facts ¶¶ 28–29; Pl.'s Facts ¶¶ 28–29.  Ultimately, Plaintiff never completed this assignment, and it had to be finished by her supervisors.  Def.'s Facts ¶¶ 29–30; Pl.'s Facts ¶¶ 29–30.  These events prompted Ms. Harry, on January 31, 2013, to issue Plaintiff an official Letter of Reprimand, stating that her "delay and failure to properly address [her] assignment" were unacceptable.  *See generally* Def.'s Ex. L, Official Letter of Reprimand, ECF No. 25-1; Def.'s Facts ¶ 31; Pl.'s Facts ¶ 31.

On February 28, 2013, Mr. Chowdhury issued Plaintiff a leave restriction letter for "ongoing deficiencies" in her attendance.  *See* Def.'s Ex. P, Leave Restriction Letter, ECF No.

25-5 [hereinafter Def.'s Ex. P], at 1; Def.'s Facts ¶ 34; Pl.'s Decl. ¶ 21.  The letter cited Plaintiff's

failure "consistently to come to work on a regular basis [and] . . . early departures during the period

of January 29 – February 26, 2013" as the basis for the leave restriction.  *See* Def.'s Ex. P at 1.

The letter required Plaintiff to obtain Mr. Chowdhury's approval for any future absence, late

arrival, or request for early departure.  *See id.*  Further, the letter advised Plaintiff that her absences

during the week of February 24, 2013, would be recorded as absent without leave, or AWOL, until

she provided medical documentation.  *See* Def.'s Facts ¶¶ 37–38; Pl.'s Facts ¶ 35.  When Plaintiff

later provided the medical documentation, her leave requests were approved.  *See* Def.'s Facts

¶ 38; Pl.'s Decl. ¶ 22.

On March 7, 2013, Plaintiff violated her leave restriction by meeting with her employment

discrimination lawyer outside of work without permission from approximately 11:30 a.m. until

4:15 p.m.  Def.'s Facts ¶ 40; Pl.'s Facts ¶¶ 39, 40.  During her absence, Plaintiff failed to respond

to a request to complete a work assignment, and ultimately did not complete that assignment.

Def.'s Facts ¶ 41; Pl.'s Facts (undisputed).  Further, when later questioned about her absence,

Plaintiff responded untruthfully, saying she was not "out of [her] office from 11:30 to 4:15 pm,

[but had gone] to lunch and returned and had to make numerous trips to the restroom for a medical

condition."  Def.'s Facts ¶ 42; Pl.'s Facts (undisputed).

On March 21, 2013, Ms. Harry proposed to one of her superiors suspending Plaintiff for

four days.  Def.'s Facts ¶ 43; Pl.'s Facts ¶ 43.  In the proposal letter, Harry specifically cited

Plaintiff's March 7th absence without leave, failure to follow instructions pursuant to the leave

restriction letter Plaintiff had received a month prior, and lack of candor about her whereabouts.

*See* Def.'s Ex. V, March 21, 2013 Proposed Four-day Suspension, ECF No. 25-11 [hereinafter

Def.'s Ex. V], at 1–4.  After considering these reasons, plus the earlier-issued Letter of Reprimand,

Deputy Executive Officer Gary Wong authorized the suspension, finding it to be "an appropriate penalty for this charge." *See generally* Def.'s Ex. W, May 2, 2013 Decision on Proposed Four-Day Suspension, ECF No. 25-12 [hereinafter Def.'s Ex. W].

Meanwhile, on April 2, 2013, Mr. Chowdhury placed Plaintiff on a sixty-day Performance Improvement Plan ("PIP"). Def.'s Facts ¶ 46; Pl.'s Facts ¶ 46. A letter notifying Plaintiff of the PIP stated that she would have sixty days to "demonstrate the required improvement in [her] performance," and that by the end of the sixty days she would have to bring her performance up to at least a minimally satisfactory level in order to avoid a reduction in grade or removal. Def.'s Ex. X, ECF No. 25-13 [hereinafter Def.'s Ex. X], at 1. The PIP listed examples of Plaintiff's unacceptable performance and discussed the steps she would have to take to come into compliance with the Administrative Management Section's standards. Def.'s Facts ¶¶ 46–55; Pl.'s Facts ¶¶ 46–54 (not disputing the contents of the PIP).

In early April 2013, Plaintiff received a second suspension for different misconduct. On April 10, 2013, Ms. Harry sent a letter to Plaintiff notifying her of a proposed five-day suspension for "insubordination and disrespectful conduct toward [her] supervisors, and failure to follow instructions." *See generally* Def.'s Ex. Y, April 10, 2013 Proposed Five-Day Suspension, ECF No. 26-2 [hereinafter Def.'s Ex. Y]; Def.'s Facts ¶ 57; Pl.'s Decl. 36 (not disputing the letter). Explaining the reasons for the suspension, the letter states that Plaintiff (1) refused to attend her mid-year performance review with Mr. Chowdhury on March 22, 2013, (2) made disrespectful remarks toward her supervisors, (3) failed to incorporate edits by a deadline, and (4) told Ms. Harry that she was not allowed in her office and that she had "had enough of [Ms. Harry]." *See* Def.'s Ex. Y at 1–4. Mr. Wong once more found that the evidence supported the charges alleged and approved a five-day suspension. Def.'s Facts ¶¶ 57–60; Pl.'s Facts ¶¶ 57–60.

On May 29, 2013, Plaintiff filed a formal EEO complaint against Mr. Chowdhury and Ms. Harry. Pl.'s Decl. ¶ 40; Def.'s Ex. A, Final Agency Decision, ECF No. 24-2 [hereinafter Def.'s Ex. A], at 1. On May 31, 2013, two days after filing her complaint and at the conclusion of the sixty-day PIP period, Ms. Harry issued Plaintiff a Notice of Proposed Removal. Def.'s Facts ¶ 61; Pl.'s Facts ¶¶ 61, 63. The Notice stated that Plaintiff had not met the due date or failed to complete "11 specifically identified assignments in Plaintiff's PIP." Def.'s Facts ¶ 62; Pl.'s Facts ¶¶ 60–62. Additionally, on June 4, 2013, Plaintiff did not receive a Within-Grade Increase based on her poor performance. Def.'s Facts ¶ 66; Pl.'s Decl. ¶ 43. On September 9, 2013, Executive Officer McConkey issued a Decision on Removal, terminating Plaintiff from her position effective September 11, 2013. Pl.'s Decl. ¶ 44.

### B. Procedural Background

Plaintiff filed her complaint in this case on March 15, 2017, alleging hostile work environment, race discrimination, and retaliation in violation of Title VII. *See* Compl., ECF No. 1 [hereinafter Compl.]. Following discovery, Defendant moved for summary judgment as to all claims on September 7, 2019. Def.'s Mot. to Dismiss & Mot. for Summ. J., ECF No. 24 [hereinafter Def.'s Mot.].

## III. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine dispute" of a "material fact" exists when the fact is "capable of affecting the substantive outcome of the litigation" and "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Elzeneiny v. District of Columbia*, 125 F. Supp. 3d 18, 28 (D.D.C. 2015).

In assessing a motion for summary judgment, the court considers all relevant evidence presented by the parties. *See Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008). The court looks at the facts in the light most favorable to the non-moving party and draws all justifiable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). If the court determines "no reasonable jury could reach a verdict in her favor," then summary judgment against that party is appropriate. *Wheeler v. Georgetown University Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016). When ruling on a summary judgment motion, courts are "not to make credibility determinations or weigh the evidence." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).

## IV. DISCUSSION

Plaintiff's race-based claims for hostile work environment (Count III) and disparate treatment (Count I) and her retaliation claim (Count II) are rooted in the same ten events: (1) the removal of certain duties, (2) the failure to train on revised duties, (3) the imposition of reprimands and suspensions, (4) the denial of alternative work schedule, (5) the restriction of leave and added scrutiny placed on her leave requests, (6) the charge of AWOL, (7) the requirement to report her daily arrival and departure times and times she left her desk, (8) the placement on a Performance Improvement Plan ("PIP"), (9) the denial of within-grade pay increase, (10) the proposed and ultimate termination from employment. *See* Compl.

Defendant moves for summary judgment on all counts.

### A. Hostile Work Environment

The court begins with Plaintiff's hostile work environment claim. Plaintiff asserts that Defendant has not moved for summary judgment on this claim. *See* Pl.'s Opp'n., ECF No. 30 [hereinafter Pl.'s Opp'n], at 34–54. Plaintiff is correct that Defendant addresses this claim for the

first time in its Reply brief, and in a footnote no less.  *See* Def.'s Reply at 3 n.1.  Nevertheless, the court will exercise its discretion and consider Defendant's challenge.  The record clearly does not support a hostile work environment claim, and the court will not permit a patently deficient claim to proceed to trial.

"To prevail on [a hostile work environment] claim, a plaintiff must show that [her] employer subjected [her] to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  The court must look "at all the circumstances, including the frequency of the [alleged] discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Vickers v. Powell*, 493 F.3d 186, 197 (D.C. Cir. 2007) (citing *Harris*, 510 U.S. at 23).

The various episodes that Plaintiff claims taken together constitute a hostile work environment generally fall into one of three categories: (1) workplace discipline, (2) confrontations with supervisors or (3) imposition of unfair burdens.  None of these types of actions, individually or considered as a whole, support a hostile work environment claim.

Starting with the first category, courts in this District have consistently held that "work-related actions by supervisors" are not "sufficient for a hostile work environment claim." *Munro v. LaHood*, 839 F. Supp. 2d 354, 366 (D.D.C. 2012) (citation omitted); *see also Welch v. Skorton*, 299 F. Supp. 3d 102, 114–15 (D.D.C. 2018); *Fields v. Vilsack*, 207 F. Supp. 3d 80, 95 (D.D.C. 2016).  Plaintiff here offers a laundry list of formal actions taken against her by her supervisors: (1) in January 2013, Ms. Harry issued Plaintiff a letter of reprimand for failing to complete the

"control number" assignment; (2) in February 2013, Ms. Harry and Mr. Chowdhury revoked her alternative work schedule and placed her on leave restrictions; (3) in March and April of 2013, Executive Officer Gary Wong approved her suspension for four days and then a second time for five days; (4) on April 2, 2013, Mr. Chowdury placed Plaintiff on a PIP, (5) on May 31, 2013, Ms. Harry issued Plaintiff a Notice of Proposed Removal; (6) on June 4, 2013, Ms. Harry denied her a within-grade pay increase; and (7) in September 2013, Mr. McConkey terminated her employment. *See* Pl.s' Opp'n. at 5–12. Such workplace discipline, absent some evidence of racial animus, cannot make out a hostile work environment claim. *See, e.g., Childs-Pierce v. Util. Workers Union of Am.*, 383 F. Supp. 2d 60, 78 (D.D.C. 2005) ("[T]he suspension was a legitimate non-discriminatory act brought about by plaintiff's *own* misconduct. Therefore, plaintiff cannot rely on the suspension . . . as evidence of a pervasively hostile work environment.").

Next, Plaintiff recites a number of workplace slights that likewise do not meet the threshold of a hostile workplace environment. In 2012, a supervisor allegedly transferred responsibility for one assignment, the 2014 Fiscal Year control number report, from Plaintiff to an Agency contractor. *See* Pl.'s Decl. ¶ 12. Plaintiff's supervisors also refused her leave requests: in August 2012 Mr. Chowdhury denied leave until she submitted a doctor's note and, while Plaintiff was on approved leave in early 2013, Mr. Chowdhury denied an upcoming request for leave after he had previously granted the request. *See* Pl.'s Decl. ¶¶ 11, 22. And, in March of 2013, Ms. Harry instituted a requirement that Plaintiff email her supervisor before leaving her desk for more than 10 minutes and to report her daily arrival and departure times. *See* Pl.'s Decl. ¶ 23. The court does not doubt that Plaintiff was genuinely hurt by these events. But "[P]laintiff must show far

more than criticisms and snubs or perceived slights to establish a hostile work environment."
*Boone v. MountainMade Foundation*, 64 F. Supp. 3d 216, 241 (D.D.C. 2014).

The final category of incidents, involving various confrontations with supervisors, do not help Plaintiff's cause either. Title VII is not meant to be a "general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted). So, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) (citing *Faragher,* 524 U.S. at 788). Here, Plaintiff asserts that, in 2009, her fourth-line supervisor, Mr. McConkey, criticized her for taking time off that had been approved informally by her immediate supervisor. *See* Pl.'s Decl. ¶ 8. In September of 2011, Mr. McConkey "screamed at [her] at the top of his lungs…causing [her] to cry." Pl.'s Decl. ¶ 11. In February 2013, Plaintiff's second-line supervisor, Jody Harry, "approached [Plaintiff] in an aggressive manner, came within about an inch of her face, and yelled at her." Pl.'s Opp'n at 10; Pl.'s Decl. ¶ 37. In January 2012, Mr. McConkey and Plaintiff's new first level supervisor Mr. Chowdhury discussed in a public place whether Plaintiff's requested leave for a surgery was necessary. Pl.'s Decl. ¶ 11. In June 2012, Mr. Chowdhury wrongly accused her of failing to follow leave policies by not calling him to request sick leave, when in fact she had done so. *See* Pl.'s Decl. ¶ 11. These events, while no doubt unpleasant, are not enough to make out a hostile work environment claim. *See Baloch*, 550 F.3d at 1195, 1199, 1201 ("[P]rofanity-laden yelling" by supervisor on many occasions, including one instance where supervisor "threatened to have [plaintiff] arrested, led out of the building in handcuffs, and jailed" were "not so 'severe' or 'pervasive' as to have changed the conditions of [the plaintiff's] employment."); *Gray v. Foxx*, 637 F. App'x 603, 605, 608 (D.C. Cir. 2015) (finding that evidence that supervisor "yelled and screamed" at plaintiff during her

employment was not sufficient to establish a hostile work environment); *Singh v. U.S. House of Representatives*, 300 F. Supp. 2d 48, 56 (D.D.C. 2004) ("Criticisms of a subordinate's work and expressions of disapproval (even loud expressions of disapproval) are the kinds of normal strains that can occur in any office setting.").

Before moving on, one episode requires additional discussion. Plaintiff asserts that on a Christmas Eve prior to 2012, when employees were encouraged to bring their children to work, "Mr. McConkey asked if [Plaintiff] brought [her] children to the office, and [she] replied that [she] had only brought [her] three year old. Mr. McConkey responded, 'Oh, you didn't bring all 19 of them,' and laughed." Pl.'s Decl. ¶ 10. Such a comment, if it occurred, is unquestionably vile and insulting. But courts consistently have held that an isolated episode such as this one is insufficient to support a claim for hostile work environment. *See George v. Leavitt*, 407 F.3d 405, 408, 416–17 (D.C. Cir. 2005) (concluding that multiple occasions where the plaintiff was shouted at by three separate employees, told to "go back where [she] came from" and that she "should never have been hired," and assigned clerical duties that white males were never required to perform did not rise to the level of severity necessary to find a hostile work environment); *Sewell v. Chao*, 532 F. Supp. 2d 126, 141 (D.D.C. 2008), *aff'd*, No. 08-5079, 2009 WL 585660 (D.C. Cir. 2009) (comments that plaintiff should retire and other "stray remarks made occasionally over an approximately eight-year period" were insufficient for hostile work environment in age-discrimination case). Plaintiff's single-episode claim falls into this category. *Cf. Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013) (suggesting that a one-time unambiguously racial epithet could be sufficient by itself to establish a hostile work environment).

In the end, when the foregoing incidents are taken together, Plaintiff has failed to carry her burden of establishing a hostile work environment. Summary judgment therefore is entered in

favor of Defendant. *See Baloch*, 550 F.3d at 1195, 1201 (affirming summary judgment to employer where plaintiff alleged several letters of reprimand, leave restrictions, two suspensions, poor performance reviews, and a verbal altercation where a supervisor threatened to have the plaintiff "arrested, led out of the building in handcuffs, and jailed"); *Aldrich v. Burwell*, 197 F. Supp. 3d 124, 138 (D.D.C. 2016) (finding no hostile work environment where plaintiff was suspended, moved to a worse workspace, reprimanded, yelled at); *Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 94 (D.D.C. 2009) (finding no hostile work environment where plaintiff experienced lowered performance evaluations, removal of important assignments, and close scrutiny of assignments by management); *Munro*, 839 F. Supp. 2d at 361, 365–66 (finding no hostile work environment where plaintiff was placed on a PIP, yelled at, given unfavorable performance reviews, and told that he could not submit any more assignments).

## B.    Disparate Treatment

The court turns next to Plaintiff's disparate treatment claim on the basis of race. In the absence of direct evidence of discrimination, Title VII claims are analyzed under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1077 (D.C. Cir. 1999). First, the plaintiff bears the burden of proving a prima facie case of discrimination. To state a prima facie case, a plaintiff need only show that she is a member of a protected class who suffered an adverse employment action that gives rise to an inference of discrimination. *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002). However, "not everything that makes an employee unhappy is an actionable adverse action." *Baird v. Gotbaum*, 662 F.3d 1246, 1250 (D.C. Cir. 2011) (citation omitted). To be "adverse" under the law, there must be "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities,

or a decision causing significant change in benefits." *Id.* at 1248 (citation omitted). Further, "[f]or employment actions that do not obviously result in a significant change in employment status—such as giving a poor performance evaluation, [or] reassigning office space . . .—an employee must go the further step of demonstrating how the decision nonetheless caused such an objectively tangible harm." *Douglas v. Preston*, 559 F.3d 549, 553 (D.C. Cir. 2009)

If a plaintiff can make out a prima facie case, the burden then shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the adverse action. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981). If the defendant advances a legitimate non-discriminatory reason for the action taken, the burden shifts back to the plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* at 253.

In the summary judgment context, however, once an employer sets forth a legitimate non-discriminatory reason for the employment action, "whether the employee actually made out a prima facie case is no longer relevant, and thus disappears and drops out of the picture." *Brady*, 520 F.3d at 493 (internal quotations omitted); *accord Nurriddin v. Bolden*, 818 F.3d 751, 758 (D.C. Cir. 2016). At that point, the court must determine whether "the employee [has] produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race." *Brady*, 520 F.3d at 494; *accord Nurriddin*, 818 F.3d at 758. Courts should consider this issue "in light of the total circumstances of the case," asking whether discrimination can be inferred from "(1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff . . . or any contrary evidence

that may be available to the employer." *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (internal quotation marks omitted).

Plaintiff identifies the same ten actions comprising her hostile work environment claim as grounds for her disparate treatment claim. So, the court must once again wade through each and every action to determine whether it could support a disparate treatment claim.

### 1. Removal of Certain Duties

Plaintiff asserts that she suffered an adverse action when management reassigned certain responsibilities—namely, work on the "2014 Fiscal Year control number report"—to an Agency contractor sometime in 2012. Pl.'s Facts ¶ 21; Pl.'s Opp'n. at 20. While the question of "[w]hether a particular reassignment of duties constitutes an adverse action for purposes of Title VII is generally a jury question," *Czekalski v. Peters*, 475 F.3d 360, 365 (D.C. Cir. 2007), no reasonable juror could find that the reassignment here was "adverse" within the meaning of Title VII. Plaintiff cites only one project as reassigned, and a few months later it was given back to her. Pl.'s Facts ¶ 21. She identifies no change in her employment status arising from the reassignment nor does she provide any evidence that the decision constituted an objectively tangible harm. Title VII does not abide "frivolous suits over [such] insignificant slights." *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001).

### 2. Failure to Train Plaintiff

Plaintiff contends that she did not receive appropriate training to complete the 2014 Fiscal Year control report—the same report she claims was wrongly reassigned to an agency contractor. *See* Pl.'s Facts ¶¶ 20, 21. Plaintiff levies this accusation in the context of her failure to complete the project. *Id*. While Plaintiff disputes the reason for her failure, she does not challenge the fact that her supervisors ultimately had to finish the project to submit it on time. Def.'s Facts ¶¶ 29,

30; Pl.'s Facts ¶ 29. Nowhere in the record does Plaintiff contend that she requested specific training on this task and that it was denied. *See generally* Pl.'s Opp'n; Pl.'s Facts; Pl.'s Decl. Moreover, Plaintiff does not contest that Mr. Chowdhury asked to meet with her multiple times *to provide her with assistance* on this project. Def.'s Facts ¶¶ 26–27; Pl.'s Facts (not disputed). Even reading Plaintiff's accusation in the light most favorable to her, she has not shown that Defendant in fact failed to "train her"—Plaintiff does not explain why Mr. Chowdhury's efforts did not suffice as an effort to "train"—or that this alleged failure to train resulted in any tangible, negative impact on her employment. *See DaCosta v. Birmingham Water Works & Sewer Bd.*, 256 F. App'x 283, 288 (11th Cir. 2007) (failure to train not an adverse action where plaintiff did not identify any class he had sought to access); *Malozienc v. Pac. Rail Servs.*, 606 F. Supp. 2d 837, 864 (N.D. Ill. 2009) ("To be an actionable adverse employment action, a plaintiff alleging failure to train must offer evidence sufficient to demonstrate that preclusion from training resulted in a tangible, negative impact on the plaintiff's employment."); *Fleming v. Sharp Mfg. Co. of Am.*, No. 11-2911-STA-dkv, 2013 WL 4432139, at *8 (W.D. Tenn. Aug. 15, 2013) (no adverse action where plaintiff had not "shown that the delay in his training had any effect on his compensation or job responsibilities."). Plaintiff's failure-to-train theory therefore fails.

### 3. Letter of Reprimand

The letter of reprimand issued to Plaintiff by Ms. Harry likewise does not, standing alone, rise to the level of an adverse action.[3] "A letter of counseling, written reprimand, or unsatisfactory performance review, if not abusive in tone or language or a predicate for a more tangible form of adverse action, will rarely constitute materially adverse action." *Herbert v. Architect of the Capitol*, 839 F. Supp. 2d 284, 302 (D.D.C. 2012) (quoting *Hyson v. Architect of the Capitol*, 802

---

[3] The court discusses below the four-day suspension imposed, in part, based on the Letter of Reprimand.

F. Supp. 2d 84, 102 (D.D.C. 2011)); *see also Baloch*, 550 F.3d at 1199 (finding that a letter of reprimand containing "job-related constructive criticism" but no "abusive language" was not materially adverse). The letter here evinces no such abusive language. It informed Plaintiff that her "delay and failure to properly address [an] assignment [was] unacceptable," and cautioned her that she was "expected to submit . . . substantially error-free work products" in the future. Def.'s Ex. L, ECF No. 25-1, at 1–2 (letter of reprimand). A reprimand letter such as this one that "[sets] forth allegations of deficient work performance" is not a materially adverse action under Title VII. *Durant v. D.C. Gov't*, 875 F.3d 685, 698 (D.C. Cir. 2017) (citing *Baloch*, 550 F.3d at 1199).

### 4. *Denial of Alternative Work Schedule*

Next, Plaintiff contends that the revocation of her alternative work schedule was discriminatory treatment in violation of Title VII. Compl. ¶ 31. "[D]enial of an alternate work schedule, by itself, is not an adverse action." *McNair v. District of Columbia*, 359 F. Supp. 3d 1, 10 (D.D.C. 2019); *see also Williams v. Donovan*, 219 F. Supp. 3d 167, 175–76 (D.D.C. 2016); *Hunter v. District of Columbia*, 905 F. Supp. 2d 364, 373 (D.D.C. 2012). Plaintiff has provided no evidence that revoking her alternative work schedule caused a material and significant change in her employment. The court therefore finds in favor of Defendant on this issue.

### 5. *Additional Scrutiny of Plaintiff's Attendance and Presence in Office and Restriction of Leave*

Plaintiff states that Ms. Harry "instituted a requirement that [Plaintiff] email her Supervisor anytime she left her desk for more than ten minutes and . . . report her arrival and departure times every day." Pl.'s Opp'n at 8. Defendant imposed this requirement after Plaintiff was absent without leave for almost five hours and lied about her whereabouts during that time. Def.'s Facts ¶ 42; Pl.'s Facts (undisputed). Such close supervision does not constitute an adverse employment action for the purposes of Title VII. *See Aldrich v. Burwell*, 197 F. Supp. 3d 124, 132 (D.D.C.

2016) ("[C]ourts . . . are near unanimous in concluding that close scrutiny, monitoring, or tracking of an employee's whereabouts—without more—simply does not rise to the level of a materially adverse retaliatory action sufficient to survive a motion to dismiss."); *Lester v. Natsios*, 290 F. Supp. 2d 11, 30 (D.D.C. 2003) (listing cases); *Achoe v. Clayton*, No. 17-CV-02231 (CRC), 2018 WL 4374926, at *8 (D.D.C. Sept. 13, 2018) ("[C]lose supervision does not constitute an adverse employment action that supports a claim under Title VII."). And, even if it could be considered materially adverse, Defendant's non-discriminatory reason for the action stand unrebutted.

Additionally, Mr. Chowdhury's decision to place Plaintiff on a leave restriction in February 2013 similarly falls short of an adverse action. Def.'s Facts ¶¶ 32–35; Pl.'s Facts ¶¶ 32–35 (not disputing her placement on leave restriction); Def.'s Ex. P. Under the leave restriction, Mr. Chowdhury required Plaintiff to provide a medical certificate to substantiate her requested sick leave. Def.'s Ex. P at 1–2. Though this requirement was not part of the usual procedure for requesting leave, Mr. Chowdhury was permitted to add this requirement pursuant to the Division's leave policy. *See id.* at 2; *see also* Def.'s Ex. R at 4. Plaintiff fails to identify any way in which the leave restriction meaningfully altered the terms or conditions of her employment. The leave restriction therefore does not qualify as an adverse action. *See Douglas-Slade v. LaHood*, 793 F. Supp. 2d 82, 98 (D.D.C. 2011) (leave restriction not adverse for retaliation claim where plaintiff was required to obtain approval from her employer in advance to take leave); *Hutchinson v. Holder*, 668 F. Supp. 2d 201, 217–18 (D.D.C. 2009) (requirement that plaintiff communicate sick leave requests to supervisor rather than follow normal procedure of communicating such requests to a co-worker was not adverse). And, even if it does, Plaintiff offers no evidence to establish pretext.

### 6. Charge of AWOL

Defendant recorded Plaintiff as AWOL for a number of days in late January and most of February 2013. Def.'s Facts ¶ 37; Pl.'s Facts (not disputing this). That designation was rescinded, however, after she submitted requested medical documentation. Def.'s Facts ¶ 38; Pl.'s Facts (not disputing this). Though ultimately compensated for this time, "the temporary deprivation of wages counts as a materially adverse action." *Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009) (citing *Greer v. Paulson,* 505 F.3d 1306, 1317 (D.C. Cir. 2007)).

Defendant offers a non-discriminatory reason for this adverse action: Plaintiff failed to provide "required information and documentation" in support of her absences. Def.'s Facts ¶ 34; Pl.'s Facts (not disputing this); Def.'s Ex. P (leave restriction letter). Plaintiff attempts to rebut Defendant's non-discriminatory reason by asserting that "Mr. Chowdhury claimed that he denied [Plaintiff's] leave because [she] failed to name her child on leave documentation . . . [but in fact Plaintiff] had previously identified her sick child to Mr. Chowdhury in a detailed phone message." Pl.'s Facts ¶ 35. Plaintiff's retort is non-responsive, as Defendant never claimed the failure to name her child as the reason for charging her with AWOL. Plaintiff does not contest any of the actual articulated reasons. *See generally* Pl.'s Opp'n; Pl.'s Facts. Accordingly, the court finds in favor of Defendant on this claim.

### 7. Suspensions

There is no dispute that Plaintiff's four- and five-day suspensions constitute actionable adverse actions. Both suspensions were without pay, *see* Def.'s Ex. W , ECF 25-12 [hereinafter Def.'s Ex. W], at 1; Def.'s Ex. Y, ECF 26-2 [hereinafter Def.'s Ex. Y], at 1, and thus caused Plaintiff to suffer a financial loss sufficient to support an adverse action*, see Greer v. Paulson*, 505 F.3d 1306, 1318 (D.C. Cir. 2007) ("[A] suspension without pay, even where an employer later

provided back pay, could be 'a serious hardship' to a reasonable employee, and thus 'materially adverse.'") (quoting *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006)); *Anyaso v. United States Capitol Police*, 39 F. Supp. 3d 34, 41 (D.D.C. 2014) ("[Plaintiff's] suspension for five days without pay constitutes a materially adverse action for purposes of establishing a *prima facie* case of discrimination because it caused him financial loss."); *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 647 (7th Cir. 2005) ("[A] suspension without pay . . . would constitute an adverse employment action.").

For both suspensions, Defendant articulates a legitimate, non-discriminatory justification. Defendant asserts that the four-day suspension was warranted because, in addition to the earlier-issued Letter of Reprimand, Plaintiff was AWOL for four hours and 45 minutes on March 7, 2013, and then lied to Ms. Harry about her whereabouts during that time. Def.'s Facts ¶¶ 40, 42; Def.'s Ex. W at 1 (Final Decision on 4-day Suspension). Plaintiff does not deny either leaving without consent or being untruthful when confronted about her absence. *See generally* Pl.'s Facts (uncontested); *see also* Def.'s Ex. U at 3 (Plaintiff's Resp. to Notice of Proposed Adverse Action) (same). Rather, she simply declares that she "*believes* that the suspension was based on her race and EEO activity,*" *see* Pl.'s Facts ¶ 43 (emphasis added), and opines without evidentiary support that "the penalty was extremely excessive, and her colleagues were not subjected to the same treatment," *id*. Plaintiff identifies not a single comparator to support her claim of unequal or unduly harsh treatment. *See* Def.'s Ex. K, ECF No. 24-13 [hereinafter Ex. K], at 34–36 (Tillman Deposition) (alleging that other colleagues were not subject to the same punishment for similar actions without providing evidence or examples). Plaintiff, in short, offers no evidence to show that her employer did not "honestly and reasonably believe[] that the underlying . . . incident occurred." *Brady,* 520 F.3d at 496.

Plaintiff similarly fails to demonstrate that Defendant did not honestly and reasonably believe she committed the acts that led to the five-day suspension. Defendant offers four reasons for the suspension: Plaintiff (1) refused to attend her mid-year performance review, (2) sent three emails that Mr. Chowdhury deemed disrespectful, including one telling him that she would not be in contact for the next week, (3) failed to submit timely edits on a project, and (4) told Ms. Harry that she was not allowed in Plaintiff's office and that Plaintiff had "had enough o[f] [Ms. Harry]." Def.'s Facts ¶¶ 57–60. Plaintiff offers a defense as to each of these explanations. She provides justifications for her refusing to attend her performance review (asserting that "she was physically and mentally unable" to meet with her supervisor alone), sending the emails at issue (countering that the emails did not show her to be "insubordinate or disrespectful"), and failing to submit edits by the deadline (claiming she attempted to incorporate revisions "to the best of her ability" and "submitted the wrong draft of the document"), but she does not deny that these events occurred. *See* Pl.'s Facts ¶¶ 57–60. She does dispute the episode with Ms. Harry, asserting that she made no such statements and that in fact "Ms. Harry approach[ed] [Plaintiff] in an aggressive manner, putting her face within an inch of [Plaintiff's] face, and scream[ed] at [Plaintiff]." Pl.'s Opp'n. at 25. But even if the court were to credit her version of these events, Plaintiff offers no evidence to show that *Mr. Wong*—who ultimately approved the suspension—did not reasonably and honestly believe that a five-day suspension was warranted. Further, Plaintiff does not assert a "cat's paw theory" that could support finding Ms. Harry responsible for Mr. Wong's ultimate decision. *See McNair*, 359 F. Supp. 3d at 7; *cf. Coleman v. District of Columbia*, 794 F.3d 49, 64 n.8 (D.C. Cir. 2015) (recognizing that a lower-level supervisor could proximately cause the employment action).

Because Plaintiff has come forward with no evidence to create a genuine dispute of fact as to whether Defendant "honestly and reasonably believe[d]" that Plaintiff engaged in the

misconduct that gave rise to her two suspensions, *Brady*, 520 F.3d at 496, the court grants Defendant summary judgment on this claim.

### 8. *Placement on a Performance Improvement Plan*

For purposes of a disparate treatment claim, mere placement on a PIP does not qualify as an adverse action, absent some further adverse effect. *See Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (finding that placement on a PIP did not qualify as an "adverse employment action" because the plaintiff did not present evidence showing the PIP affected her grade or salary). Here, the PIP is connected to an adverse action: her termination. *See* Def.'s Facts ¶ 62. Accordingly, in this case, placement on the PIP constitutes an adverse action.

Defendant proffers a number of legitimate, non-discriminatory reasons for placing Plaintiff on a PIP, including: (1) she did not complete the updated justification narrative for the Office of Management and Budget for Fiscal Year 2014, requiring her supervisor to finish the assignment, (2) she did not timely make edits to the CRT Congressional Justification, (3) she did not meet the deadline for the Fiscal Year 2013 budget operating plan, requiring her supervisor to complete the assignment, (4) she lied to her supervisors about her whereabouts when she was out of the office on March 7, 2013, (5) she did not timely complete payroll projections without substantial involvement from her supervisor, and (6) she demonstrated a "lack of attention to detail, causing obligations to be over or understated." Def.'s Facts ¶¶ 48, 52, 54.

Plaintiff defends herself by attempting to explain each of these events but does not dispute the underlying deficiencies in her work performance or the cited workplace misconduct. She does not contest that she failed to complete three assignments on time, and that her supervisors completed two of them; that she lied about her whereabouts; or that she required substantial involvement from a supervisor to complete payroll projections. *See* Pl.'s Facts ¶¶ 48, 52, 54. For

example, Plaintiff argues that she was not timely given information from other departments needed to complete the OMB submission, the CRT justification, and the budget operating plan. *Id.* ¶ 48 She claims that she did not receive the necessary information to complete the OMB submission until February 2013. *Id.* However, email records show that supervisors asked for a final draft on January 7, 2013, and by that point Plaintiff had been in possession of the information since "the 18th," presumably of December. Def.'s Ex. X at 16–17; Def.'s Reply Facts ¶ 48. Plaintiff likewise avers that she did not have information needed to complete the CRT Congressional justification because "[o]ther departments delayed in submit[ing] to her the information she needed." Pl.'s Facts ¶ 48. Yet, emails from that time do not include any reference to a delay caused by the failure of other departments to submit timely information. *See* Def.'s Ex. X at 23–38; Def.'s Facts ¶ 48.

Plaintiff provides no evidence to establish that her supervisors, Ms. Harry and Mr. Chowdhury, did not honestly and reasonably believe that there was a performance-based justification for placing her on a PIP. The PIP therefore does not support her claim of discrimination.

### 9. *Denial of Within-Grade Pay Increase*

Ms. Harry's denial of Plaintiff's in-grade increase on June 4, 2013, is clearly an adverse action, as Plaintiff suffered a tangible financial harm. *See Qihui Huang v. Pai*, 266 F. Supp. 3d 51, 60 (D.D.C. 2017), *aff'd*, No. 17-5290, 2019 WL 668269 (D.C. Cir. Jan. 30, 2019) ("The Agency's denial of [plaintiff's] within-grade increase is undisputedly an adverse action, as she suffered a direct diminution in pay."); *see also Douglas v. Donovan*, 559 F.3d 549, 553 (D.C. Cir. 2009) (discussing certain actions impacting pay as sufficiently tangible impacts to be considered adverse).

Defendant justifies the denial of the pay increase on the ground that Plaintiff was "not performing at an acceptable level of competence (i.e., performance at the successful level or above)." Def.'s Mot. at 17–18. Under the OPM guidelines, to merit a within-grade increase, an employee must perform at a level of "successful" or above. *See* Def.'s Facts ¶ 67; Pl.'s Facts (not contesting this). In the April 2013 letter to Plaintiff informing her that she was being placed on a PIP, Defendant detailed four areas in which Plaintiff's performance was not "minimally satisfactory." *See* Def.'s Ex. X at 1 (internal quotations omitted). Plaintiff challenges the validity of these criticisms, *see* Pl.'s Facts ¶¶ 48, 52, 54, but for the reasons already discussed, she does not succeed. Plaintiff cannot create a reasonable inference of pretext by merely trying to explain away her workplace failings and insisting without evidence that her supervisors were motivated by discrimination. *See* Pl.'s Facts ¶¶ 65, 68 (claiming only that Plaintiff "has provided extensive evidence [ ] of discrimination and retaliation"). She therefore has failed to make out a disparate treatment claim based on the denied within-grade pay increase.

### 10. Termination

Defendant proposed Plaintiff for termination on May 31, 2013, and terminated her on September 11, 2013. *See* Def.'s Facts ¶ 61; Pl.'s Facts ¶¶ 61, 63; Pl.'s Decl. ¶ 44; Def.'s Mot. at 7.

#### a. Failure to exhaust

As a preliminary matter, Defendant claims that Plaintiff failed to exhaust her administrative remedies for her termination claim. Def.'s Mot at 5. Plaintiff included the *proposed* termination when she filed her administrative complaint in May of 2013, but did not amend her complaint after her firing in September. Def.'s Facts ¶¶ 1–2; Pl.'s Facts (undisputed). Title VII complainants must timely exhaust their administrative remedies before bringing their claims to federal court. *Hamilton v. Geithner*, 666 F.3d 1344, 1349 (D.C. Cir. 2012). In *National Railroad Passenger*

*Corporation v. Morgan,* the Supreme Court addressed the administrative exhaustion requirement as it relates to multiple, related allegations of discrimination for discrete acts that occurred *before* a Title VII plaintiff files an administrative complaint and held that a plaintiff must file an administrative charge for each incident. 536 U.S. 101, 114–15 (2002). The Court did not, however, reach the question of how to treat discriminatory or retaliatory incidents that occur *after* an administrative complaint is filed, as is the case here. *See id.* at 115–16. Likewise, the Circuit has declined to decide the question. *See e.g., Payne v. Salazar,* 619 F.3d 56, 65 (D.C. Cir. 2010): *Weber v. Battista,* 494 F.3d 179, 183–84 (D.C. Cir. 2007).

Without clear controlling authority, a split has developed in this District as to whether separate exhaustion is required for claims based on events occurring after the filing of an administrative complaint. *See Mount v. Johnson,* 36 F. Supp. 3d 74, 84–86 (D.D.C. 2014) (explaining this dispute and listing cases). Most judges have concluded that plaintiffs must exhaust administrative remedies with respect to later-accruing claims. *See, e.g., id.*; *Hunter v. District of Columbia*, 797 F. Supp. 2d 86, 95 (D.D.C. 2011) (Berman Jackson, J.); *Reshard v. LaHood*, No. 87-2794, 2010 WL 1379806, at *13 (D.D.C. Apr. 7, 2010) (Walton, J.), *aff'd*, 443 F. App'x 568 (D.C. Cir. 2011); *Camp v. District of Columbia*, No. 04-234, 2006 WL 667956, at *7–8 (D.D.C. Mar. 14, 2006) (Kollar-Kotelly, J.); *Keeley v. Small*, 391 F. Supp. 2d 30, 40–41 (D.D.C. 2005) (Bates, J.); *Coleman-Adebayo v. Leavitt*, 326 F. Supp. 2d 132, 136–39 (D.D.C. 2004) (Friedman, J.). A few judges have read *Morgan* more narrowly, to hold that a new claim need not be separately exhausted if it would have come within the "scope of any investigation that reasonably could have been expected to result." *Hairston v. Tapella*, 664 F. Supp. 2d 106, 115 (D.D.C. 2009) (Roberts, J.) (quoting *Hazel v. WMATA*, No. 02-1375, 2006 WL 3623693, at *8 (D.D.C. Dec. 4, 2006)); *Louis v. Hagel*, 221 F. Supp. 3d 40, 44 (D.D.C. 2016) (Chutkan, J.) ("[A] plaintiff may

bring a lawsuit only for 'claims that are like or reasonably related to the allegations of the charge and growing out of such allegations.'") (quoting *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995)).

The court need not decide between the two approaches, because even if exhaustion were required, Defendant has suffered no prejudice from Plaintiff's failure to amend her administrative complaint. "Exhaustion of administrative remedies is generally required before filing suit in federal court so that the agency has an opportunity to exercise its discretion and expertise on the matter and to make a factual record to support its decision." *See Oglesby v. United States Dep't of the Army*, 920 F.2d 57, 61 (D.C. Cir. 1990). Here, the investigative file included a copy of the removal decision prepared by McConkey, who had the final say on Plaintiff's termination, and his decision adopted the conclusion set forth in the proposal to remove Plaintiff. *See* Def.'s Ex. A at 21. Thus, even though the file did not contain an interview of McConkey, the agency's final decision took that adverse action into account and the reasons for it. The failure to exhaust therefore would not be an appropriate basis on which to award judgment in Defendant's favor. *Cf. Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997) (stating that failure to exhaust is an affirmative defense subject to principles of equity).

b.    Pretext

Defendant proffers a legitimate, non-discriminatory reason for Plaintiff's termination and subsequent dismissal: Plaintiff's unacceptable performance during the PIP period.[4] Def.'s Mot. at 15–16. Plaintiff does not genuinely contest these facts. *See* Pl.'s Facts ¶¶ 60 ½, 62. Instead, she provides justifications for her deficient performance. *See id.* ¶ 60 ½ (complaining that she was

---

[4] Both parties discuss these reasons specifically in the context of Plaintiff's *proposed* removal. However, Defendants provide ample evidence that Plaintiff's performance did not improve through the PIP process, which likewise provides a basis for removal. Further, McConkey adopted the conclusions set forth in the proposal as part of his decision to approve the termination. Def.'s Ex. A at 21.

placed on PIP for duties she was not required to perform and did not receive adequate training, and claiming that "she was singled out and unfairly targeted for harassment and discipline by her supervisors").

The Circuit's decision in *Waterhouse v. District of Columbia*, which rests on remarkably similar factual grounds, is instructive in this case. 298 F.3d 989 (D.C. Cir. 2002). There, the trial court granted summary judgment for the defendant where it terminated plaintiff because she: (1) delayed submitted fiscal year closing packages, (2) did not meet deadlines for budget formulation, and (3) did not pay vendors on time. *See id*. at 994–95. The plaintiff in that case admitted that she had missed deadlines but argued that she was not solely responsible for the delay and should have received greater support. *See id*. at 995. The court found that "[b]ecause [plaintiff] did not contravene—and in fact admitted—many of the deficiencies the defendants cited concerning her performance, she failed to establish that her 'employer's proffered explanation [was] unworthy of credence.'" *Id*. (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000)). The Circuit held that "[a]t best, her responses constituted an argument that, notwithstanding those failings, the District should not have terminated her because there were extenuating circumstances and there were some positive attributes to her performance." *Id*. This, the Circuit found, was not sufficient to defeat summary judgment, because "courts are without authority to 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.'" *Id.* (citing *Fischbach v. District of Columbia Dep't of Corr.*, 86 F.3d 1180, 1182 (D.C. Cir. 1996)).

Similarly, here, Plaintiff admits that she failed to complete or did not meet the due date for eleven projects. Def.'s Facts ¶ 62; Pl.'s Facts ¶¶ 60 ½, 62. Two of these projects were ultimately completed by a supervisor or her colleagues. *Id*. In one instance, Plaintiff submitted a colleague's work as her own. *Id*. In response to these charges, Plaintiff argues that some of the assignments

were things that she had not done before, and that she needed guidance for that work, which was not provided. *See* Pl.'s Facts ¶ 60 ½; Def.'s Ex. K at 39. She also claims that she was unable to complete two of the assignments because she had to take "approved FMLA leave." Pl.'s Opp'n. at 32; Pl.'s Decl. ¶¶ 34, 35.

Plaintiff's excuses, however, provide no basis to conclude that Defendant's reasons for terminating her were pretext for race discrimination. Like *Waterhouse*, Plaintiff here admits to the performance deficiencies cited by Defendants as the basis for her termination. She argues, essentially, that there were extenuating circumstances that justify her poor performance. None of this provides grounds for a "rational juror to conclude that the reason she was fired was racial discrimination rather than poor performance." *Waterhouse*, 298 F.2d at 995; *see also McGrath v. Clinton*, 666 F.3d 1377, 1384 (D.C. Cir. 2012) (defendant entitled to summary judgment where plaintiff did not contest failure to perform certain duties, one of which was completed by a colleague, but provided extenuating circumstances to justify failure); *see also Crowley v. Perdue*, 318 F. Supp. 3d 277, 291 (D.D.C. 2018) ("[Plaintiff] cannot rely on his proffered extenuating circumstance for his criticized work as evidence of pretext.") (quotation omitted).

Finally, Plaintiff has provided one clear example of a discriminatory statement by a decision-maker involved in her termination: Mr. McConkey's statement at a company Christmas party asking why Plaintiff had not brought "all 19" of her children. Pl.'s Decl. ¶ 10. While Mr. McConkey did not propose Plaintiff's termination, he did ultimately sign off on the decision. *See* Def.'s Ex. A at 21; Pl.'s Opp'n at 11. However, this one comment, made *years* before Plaintiff's termination, cannot rebut Defendant's plethora of legitimate, non-discriminatory reasons. "Stray comments lacking 'any temporal or substantive relationship' to the adverse employment action are not evidence of discriminatory intent." *Wang v. WMATA*, 206 F. Supp. 3d

46, 74 (D.D.C. 2016); *accord Samuel v. Metro. Police Dep't*, 258 F. Supp. 3d 27, 47 (D.D.C. 2017). Plaintiff therefore has failed to carry her burden as to her claim of termination based on her race.

### C.    Retaliation

At last, the court addresses Plaintiff's retaliation claims. The familiar burden-shifting Title VII framework applies to retaliation claims. A plaintiff must first show "(1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two." *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009). "'Adverse actions' in the retaliation context encompass a broader sweep of actions than those in a pure discrimination claim." *Baloch*, 550 F.3d at 1198 n.4. In the retaliation context, an adverse action is one that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*. at 1198 (citation omitted). Once a plaintiff has made out a prima facie case, the burden shifts to the defendant to provide a "legitimate, nondiscriminatory reason" for its actions. *Id*. If they do so, the burden shifting framework disappears and the court must determine whether a reasonable jury could infer retaliation from all the evidence. *Id*.

Plaintiff made three EEO complaints, including two formal complaints, which could be the basis for a retaliation claim: (1) On May 23, 2012, Plaintiff filed a complaint of discrimination against Ms. Harry, Mr. Chowdhury, and Mr. McConkey; (2) on March 11, 2013, Plaintiff reported being subject to discrimination, retaliation, and a hostile work environment by Ms. Harry and Mr. Chowdhury, and (3) on May 29, 2013, Plaintiff filed a formal complaint against Ms. Harry and Mr. Chowdhury. *See* Pl.'s Decl. ¶¶ 10, 24, 40; Def.'s Ex. A at 1–2.

First, some of the adverse events alleged by Plaintiff are distant in time from her protected activity. Her complaint for the denial of an alternative work schedule occurred in January 2009,

long before she made any reports to the EEOC. Further, the Letter of Reprimand issued in January 2013 and the leave restriction letter issued in February 2013 came eight and nine months, respectively, after her first formal EEO complaint filed in May 2012. As Plaintiff provides no evidence that these actions were tied to her EEO complaint, there is no reason to conclude that these actions were retaliatory. *Cf. Talavera v. Shah*, 638 F.3d 303, 313 (D.C. Cir. 2011) ("Although an adverse action that occurs shortly after protected activity can be part of a finding of retaliation, positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine[.]") (citations and internal quotation marks omitted).

Plaintiff also alleges that the removal of certain job responsibilities was retaliatory. However, nothing in the record supports this claim. She was assigned the Fiscal Year 2014 control number report in July 2012, about two months after her EEO complaint. At some point in 2012, this assignment was given to a contractor, and in December 2012 was returned to Plaintiff. That Defendant reassigned one of Plaintiff's projects some unknown number of months after her May 2012 EEO complaint, when Defendant had likewise initially assigned the project to Plaintiff after the EEO complaint, provides no basis to believe the decision was retaliatory. Further, though adverse actions in the retaliation context sweep more broadly, no reasonable jury could find that plaintiff "suffered from diminished . . . responsibilities" because one project was temporarily reassigned. *Houston v. SecTek, Inc.*, 680 F. Supp. 2d 215, 222 (D.D.C. 2010).

The requirement that Plaintiff email her supervisor before leaving her desk for more than ten minutes and report her arrival and departure times is not considered materially adverse for purposes of a retaliation claim. *See Aldrich v. Burwell*, 197 F. Supp. 3d 124, 134 (D.D.C. 2016) (close monitoring of employee's whereabouts not adverse action in retaliation claim).

Additionally, Plaintiff's failure-to-train claim falls flat here for the same reason discussed above; the undisputed evidence shows that her supervisor actively offered to train her. Def.'s Facts ¶¶ 26–27; Pl.'s Facts (not disputed).

What remains are Plaintiff's claims for retaliation based on: (1) temporary AWOL, (2) four-day suspension, (3) five-day suspension, (4) placement on a PIP, (5) denial of within-grade pay increase, and (6) proposed termination. When analyzing her discrimination claim, the court found that for each of these actions Plaintiff had failed to rebut Defendant's proffered non-discriminatory justification. Plaintiff provides no additional evidence to establish that retaliation was the true reason for these actions. *See* Pl.'s Opp'n at 33–34. For the same reasons then, Plaintiff cannot make out a retaliation claim.

Plaintiff argues that the temporal proximity of three of these actions to her protected activities is sufficient to establish causation as to those actions. Pl.'s Opp'n at 33. Specifically, she notes that the four-day suspension came only 10 days after her March 11, 2013 complaint, while the five-day suspension issued approximately one month later. *Id*. at 34. Defendant delivered the notice of proposed termination two days after she filed her May 29, 2013 formal complaint. *Id*. Although temporal proximity can establish a prima facie case of retaliation, *Hamilton*, 666 F.3d at 1357, more is needed to rebut evidence of a legitimate justification, *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007) ("If temporal proximity sufficed to rebut a legitimate proffer, then protected activities would effectively grant employees a period of immunity, during which no act, however egregious, would support summary judgment for the employer in a subsequent retaliation claim."); *Allen v. Johnson*, 795 F.3d 34, 47 (D.C. Cir. 2015) (same). For each action that took place closely following a protected action, Defendant has provided a legitimate rationale. Thus, Plaintiff must provide "positive evidence beyond mere

proximity." *Allen*, 795 F.3d at 47. Plaintiff provides no such proof. Instead, she repeats the same arguments the court found lacking in its consideration of her discrimination claims. P.'s Opp'n. at 33–34 (referring to prior arguments); section IV(B), *supra*. These arguments fare no better in the retaliation context. Defendant is entitled to summary judgment on this claim.

## V.     CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted. A final appealable order accompanies this Memorandum Opinion.

Dated:  June 20, 2019

Amit P. Mehta
United States District Court Judge